AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

### DISTRICT OF DELAWARE

In the Matter of the Search of
(Address or brief description of property or premises to be seized)

Washington Mutual Bank Account
Number ▮▮▮▮5605

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

Case Number: 07- 82M

I, __Michelle K. Carron__ being duly sworn depose and say: I am a(n) Special Agent, Federal Bureau of Investigation, and have reason to believe that in the Middle District of Florida there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

the contents of Washington Mutual Bank account number ▮▮▮▮5605  **REDACTED**

which is (state one or more bases for seizure under the United States Code)

property involved in transactions in violation of 18 U.S.C. § 1960, or is traceable to such property and as such is forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(A)

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof.   X  Yes   ___ No

_Signature of Affiant_
Michelle K. Carron
Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

April ___, 2007                                at   Wilmington, Delaware
Date                                                    City and State

Honorable Mary Pat Thynge
United States Magistrate Judge
District of Delaware
Name and Title of Judicial Officer                  Signature of Judicial Officer

FILED
MAY 16 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

7. Title 18 U.S.C. Section 1960(b)(1) describes an "unlicensed money transmitting business" as a "money transmitting business which affects interstate or foreign commerce in any manner" and (a) "is operated without an appropriate money transmitting license in the State where such unlicensed operation is punishable as a misdemeanor or felony under State law;" (b) "fails to comply with federal money transmitting business registration requirements under section 5330 of Title 31, United States Code;" or (c) "involves the transportation or transmission of funds known...to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."

8. The term "money transmitting" is defined in 18 U.S.C. Section 1962 (b)(2) to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b) (2).

9. Under Delaware law, the failure of a money transmitting business to obtain a license is punishable as a misdemeanor. See 5 Del. Code 2317 and 5 Del. Code Section 2303 ("No person...shall engage in the business of selling checks, or issuing checks, or engage in the business of receiving money for transmission or transmitting the same without first having obtained a license hereunder.") Therefore, money transmitting businesses subject to Delaware law that operate without a valid license violate 18 U.S.C. § 1960(a) and (b)(1)(A).

10. Under 31 U.S.C. § 5330 and regulations promulgated thereunder, certain money services businesses (MSBs) are required to register with the Financial Crimes Enforcement Network (FINCEN) of the U.S. Department of Treasury. MSBs must register by completing form TD F 90-17. 22.55, Registration of the Money Services Business. Registration is the responsibility of the owner or controlling person of the MSB. The owner or controlling person must sign and file the completed form with the IRS Detroit Computing Center, Money Services Business Registration.

11. Under 31 U.S.C. § 5330(d)(1), and regulations promulgated thereunder, including 31 C.F.R. Sections 103.11 (uu) and 103.41, a business meets the definition of a MSB, and must register with FINCEN, if it provides one or more of the following products or services:
   - Money transmission or remittance;
   - Check cashing;
   - Issuing or redeeming money orders, traveler's checks, stored value (debit) cards, or similar instruments;
   -Currency dealing or exchange; or
   -Informal money transfers.

Therefore, MSBs that operate without registering with FINCEN are in violation of Title 18 U.S.C. Section 1960(a) and (b)(1) (B).

### Background on Digital Currency Issuers and Exchangers

12. The term "digital currency" has been adopted by Internet-based "sellers" of gold, silver, platinum and other precious metals to describe the use of precious metals as a private currency for

online payments. There are many types of digital currency issuers operating on the Internet. Some of the digital currency issuers that are currently operating include E-bullion, E-silver, Goldmoney, and Pecunix.

13. One of the most popular digital currency issuers is E-Gold Ltd., a Nevis corporation, which created e-gold, a private currency. E-gold is traded through the Internet and is accepted by a number of on-line merchants and vendors. According to the E-Gold Ltd.'s website (www.e-gold.com), e-gold is an electronic currency 100% backed at all times by gold bullion located in E-Gold Ltd. storage vaults. E-gold is integrated into an account based payment system that utilizes gold as money. Customers around the world may establish an e-gold account via the website. The e-gold account is denominated in gold weight, i.e., the amount of gold grams or ounces that the account holder owns. The e-gold payment system enables the e-gold account holder to transmit via the Internet specified weights of gold to other e-gold accounts. Thus, only the ownership of the gold changes - the actual gold in the E-Gold Ltd. storage vaults is never transferred. This transfer of ownership of gold through the crediting and debiting of Internet-based accounts is how E-Gold Ltd. facilitates payments on behalf of their customers. Only a valid email address is required to open an e-gold account. As a result, e-gold accounts provide a certain level of anonymity to the users.

14. Once an e-gold account is opened, it must be funded. According to the E-Gold Ltd. website, there are two ways to fund an e-gold account: 1) receive payment in e-gold from another e-gold account holder; or 2) exchange your national currency, such as U.S. dollars, for e-gold using the services of an on-line digital exchanger. An on-line digital currency exchanger will take national currency from a customer and charge a fee to exchange the currency into e-gold for the purpose of funding or increasing the value of an e-gold account. By the same token, an exchanger will also "exchange" the value in an e-gold account into a national currency. Exchange companies are typically the only method by which customers can obtain the value out of an e-gold account, short of taking possession of the gold itself.

15. Each exchange company offers different methods to exchange national currency for e-gold and other digital currencies. Some exchange companies accept cash and money orders, while others accept transfers from bank accounts or credit cards. Some exchange companies provide debit cards which can be funded with digital currency. The debit card can then be used to withdraw currency at ATMs up to the value of the digital currency on deposit with the exchanger. The exchanger generally operates independently from the digital currency issuer.

16. On-line exchange companies do not verify the identities of their customers. Due to the high service fees charged by digital currency issuers and exchange companies, a digital currency account holder can expect to spend upwards of 10-15% to maintain and/or utilize digital currency to make on-line payments. Thus, there appears to be no economically sound reason for using digital currencies; however, with the anonymity the system affords, users can escape the scrutiny of financial institutions and/or of law enforcement.

### State and Federal License /Registration Checks

18. On March 16, 2007, Special Agent (SA) Melissa Marsh, Internal Revenue Service, advised

that GitGold Worldwide, Inc. is not registered with FINCEN as a Money Service Business (MSB).

19. The State of Delaware Office of the State Bank Commissioner is responsible for issuing licenses to business applicants seeking to operate as a money transmitting business. On March 19, 2007, Fred Lowden, Office of the State Bank Commissioner, advised that GitGold Worldwide, Inc. is not registered as a MSB in the State of Delaware.

### The Investigation

GitGold Internet Advertising

20. GitGold Worldwide, Inc. advertises on its website, www.gitgold.com, the exchange of currency in the form of a bank wire, money order, cashier's check, or cash. The website further states that when funds are received, they can be used to fund e-gold, goldmoney, e-bullion, or netpay accounts. GitGold Worldwide, Inc. also advertises that customers can go to the physical location, 2117 S. Babcock St, Melbourne, FL, with cash deposits to fund digital currency accounts, provided they give one day's advance notice.

21. GitGold Worldwide, Inc. charges customers depositing $200.00 or more a fee of 5% of their deposit. For example, for every $200.00 sent, the customer receives $190.00 worth of gold. Amounts less than $200.00 are funded at the minimum funding fee of $10.00.

FBI Interview

22. On April 27, 2004, Jane Anderson was interviewed by SA Shane Utter, FBI, Dallas Division. In this interview, Anderson informed SA Utter that she and her husband are the owners of an e-gold company called www.gitgold.com. According to Anderson, the company has existed since 1996 and is involved in e-commerce trade, trading money for e-credits to purchase gold.

Undercover Investigation

23. On November 8, 2006, SA Michael Brian, FBI, Baltimore Division, while acting in an undercover capacity, inquired about how to conduct a bank wire through the www.gitgold.com website. On November 9, 2006, "Dave" from www.gitgold.com replied that money orders are the preferred method for sending funds because "we don't have to confirm your identity." Dave further stated that the customer should send a money order to ███████ St, Melbourne, FL and include name, type of currency requested, account number and account name.

24. On November 17, 2006, SA Peter Gangel, FBI, Baltimore Division, Wilmington, Delaware Resident Agency, mailed a USPS money order from Wilmington, Delaware, in the amount of $146.72 to ███████ St, Melbourne, FL and requested that the money be sent to e-gold account number ██5809, account name Mister Anderson. SA Brian then emailed ███████@aol.com stating the same information.

25. GitGold Worldwide, Inc. advertises on their website that upon receipt of money orders, the money orders are verified and then GitGold Worldwide, Inc. immediately funds the account.

GitGold Worldwide, Inc. then emails the customer to let them know their funds were received and their accounts funded.

26. On November 17, 2006, SA Brian received an email from davidandersonfl@aol.com, thanking him for the "headsup" about the payment. On November 20, 2006, SA Brian received an email from ▇▇▇▇@aol.com, stating that $136.72 had been sent to the specified e-gold account.

27. On December 6, 2006, U.S. Postal Inspector Yvette Thomas advised that the postal money order was deposited into Washington Mutual Bank account ▇▇▇5605, the subject account, and negotiated on or about December 4, 2006.

Review of Washington Mutual Account number ▇▇▇5605

28. I obtained bank records from Washington Mutual for account number ▇▇▇5605, in the name of GITGOLD WORLDWIDE, INC. The records reflect that the account was opened on June 21, 2004, by Jane R. Anderson, who has joint signature authority on the account with her spouse, David L. Anderson.

29. The account receives customer deposits almost daily and wire transfers from a separate Washington Mutual bank account multiple times per week. After funds are deposited by one of these two methods, they are almost immediately transmitted out via wire transfer, multiple checks paid, and a multitude of electronic transfers to specific customers.

30. For example, the following is the activity for December 2006 and January 2007.

December 2006
| | |
|---|---|
| Customer Deposits: | + $263,086.41 |
| Incoming Wire transfers: | + $9,557.00 |
| Outgoing Foreign Wires: | - $217,000.00 |
| Electronic transfers to customers: | - $7,689.84 |
| Checks Paid: | - $86,173.21 |

January 2007
| | |
|---|---|
| Customer Deposits: | + $208,933.56 |
| Incoming Wire transfers | + $15,935.00 |
| Outgoing Foreign Wires: | - $118,000 |
| Electronic transfers to customers | - $6,687.33 |
| Checks Paid: | - $66,181.22 |

31. In the thirteen month period of bank records reviewed by your affiant, $3,311,466 was deposited into this account and $3,271,236 was transmitted out of the account.

32. Washington Mutual provided transaction detail reports for account ▇▇▇5605 for the period of February 2006 through January 2007. In that period of time, GitGold Worldwide, Inc. transmitted funds by wire seventy-seven times, benefiting Gold & Silver Reserve, Inc., 2▇ ▇▇▇▇ Street, Melbourne, FL, for a total of $2,099,210. Of these, seventy-six specifically stated the transmitted funds were benefiting GitGold Worldwide, Inc. e-gold account ▇0679.

33. Based upon my review of the Washington Mutual bank records, the bank activity above is indicative of a company operating as a money service business. It is apparent that the GitGold Worldwide, Inc. account was used primarily as a conduit to quickly transmit funds received from customers to other on-line digital currency issuers and exchange companies. Accordingly, it is reasonable to believe that GitGold Worldwide, Inc. was transmitting these funds pursuant to customers' instructions to buy or sell digital currency, as well as to fund e-gold accounts.

E-Gold Investigation

34. The e-gold website, www.e-gold.com, states that e-gold was developed as an Internet payment system by Gold and Silver Reserve (G&SR), Inc, a Delaware Corporation in 1996 and that G&SR continues to serve as the operator of the e-gold system.

35. The FBI issued a number of administrative subpoenas in their investigation into e-gold, Ltd. A review of records obtained as a result of those subpoenas determined that GitGold Worldwide, Inc. has been utilizing e-gold account number ▮0679 for its operations since May 2001. Analysis of activity occurring in this account from May 2001 through March 2007 yielded the following results: There were 31,064 transactions with a total value of $24,065,399, comprised of 5,140 transactions into the e-gold account valued at $12,047,797, and 25,924 transactions out of the account valued at $12,017,602. As of March 2007, approximately $36,000 remained in e-gold account number ▮0679.

## Conclusions

Based upon the investigation to date in this case, and on my training and experience in financial fraud investigations, it appears that from January 2006 through January 2007, GitGold Worldwide, Inc., operating in the District of Delaware and elsewhere, utilized its account at Washington Mutual Bank to control, manage, and operate an illegal, i.e. unlicensed, money transmitting business in violation of Title 18, U.S.C., Section 1960. Therefore, this account is subject to forfeiture pursuant to Title 18, U.S.C., Sections 981(a)(1)(A) and 984.

Michelle K. Carron, Special Agent
Federal Bureau of Investigation

SWORN AND SUBSCRIBED TO THIS
___ day of April 2007.

Mary Pat Thynge
United States Magistrate